THE PEOPLE, *ex relatione* RICHARD J. HAMILTON, *v.* THE BOARD OF COMMISSIONERS OF THE ILLINOIS AND MICHIGAN CANAL.

*Application for a Writ of Mandamus.*

In construing statutes, we should look at the real object and intention of the law makers, as gathered from an examination and comparison of the context of the whole act,—its spirit, and import.

If it is apparent, that, by a particular construction of a statute, in a doubtful case, great public interests would be endangered or sacrificed, it ought not to be presumed that such construction was intended by the legislature.

It is not the province of a court to decide upon the expediency and propriety of a statute, but to ascertain its just, reasonable, and true construction; and when this is satisfactorily ascertained, it has only to pronounce the decision.

An assignee of a certificate of purchase of a Canal lot in Chicago or Ottawa, in 1836, is entitled to all the rights of the original purchaser, and he may, under the

" *Act for the relief of purchasers of Canal lots in Chicago and Ottawa, in* 1836," apply the payments made on such lot, in part payment of any lot purchased by himself, and forfeited for non compliance with the conditions of purchase; and it is the duty of the Board of Canal Commissioners to allow such application; and, in case of refusal, a writ of *mandamus* will be granted against them.

THIS cause was submitted upon an agreed statement of facts, made by J. Young Scammon, counsel for the relator, and I. N. Morris, President of the Board of Commissioners of the Illinois and Michigan Canal, by which it appeared that the relator was the purchaser of lot four [4] in block two [2], in the original town of Chicago, at the canal sale in 1836, and had made partial payment therefor, but had forfeited the lot by failing to make the subsequent payments, according to the terms of sale. That Henry G. Hubbard was also a purchaser at said sale, of other lots in said town, which he had in like manner forfeited. That Hubbard had assigned his certificates of purchase to Hamilton, and Hamilton had tendered to the Treasurer of the Board the payment for said lot four [4], by applying the payments made by Hubbard upon said lots purchased by him, with other payments, upon said lot four [4], and had at the same time offered to relinquish the lots purchased by Hubbard. That the Treasurer and the Board refused to permit him to make such application, or to pay for said lot by the application of the payments made by Hubbard.

The agreed case also stipulated that the questions in difference should be submitted to the final decision of this Court, without the issuing or serving of a rule to show cause, or of an alternative *mandamus*, and that upon the determination of the matter in controversy, by this Court, a peremptory writ of *mandamus* should issue to the defendants, provided the case was a proper one for the issuing of a writ of *mandamus*, and provided the law was with the relator. It was further stipulated and agreed, that the only question to be adjudicated by the Court, was as to the right of said relator to apply the payments made by said Hubbard, upon the lot selected by said relator, and in part payment therefor, under the statute.

J. YOUNG SCAMMON, for the relator.

L. TRUMBULL and I. N. MORRIS, for the defendants.

SMITH, Justice, delivered the opinion of the Court:

This case is submitted by the parties to the Court, for its decision on the statement of facts contained in an agreed case.

It is an application for a writ of peremptory *mandamus*, against the Canal Commissioners, to compel them to allow the relator to make a selection of a certain lot, to wit, number four [4] in block number two [2], in the original town of Chicago, heretofore purchased by the relator, at a public sale of lots, in that town; and to apply certain certificates of purchase of other lots, in said town,

The People *v.* The Canal Commissioners.

and payments made thereon, by himself, as, also, four other certificates of payment, by another person, which have been *bona fide* assigned to the relator; and for such Commissioners to accept and receive the same, on the relator's relinquishing all his title to the lots specified in the three other certificates of his purchase, and of the four assigned certificates, under the act entitled "*An Act for the relief of purchasers of Canal lots in Chicago and Ottawa, in* 1836," approved 27th of February, 1841; (1) and further to direct, in pursuance of the said act, a patent to be procured and delivered by the Commissioners to the relator. It is mutually agreed to, and stipulated, by the parties of the case, that the only question to be decided is, as to the right of the relator to apply the payments, made by his assignor, to the lot selected by him, and in part payment thereof.

The better to understand the character of the application, and its merits, it will be necessary to briefly recite the provisions of the act. The first section declares, that all persons who have, heretofore, purchased any of the property belonging to the canal, any of the canal lands, or of any of the lots in any town sold by the authority of the State; and who have made advances to the State, by way of payment for the same; and who have, by any means, forfeited the same, by not complying with the other stipulations of the contract, shall be entitled to the relief hereinafter granted, upon the conditions hereinafter mentioned, to wit: every person, who has paid any money upon such purchases, shall first ascertain the amount, from the proper authority; and next he shall have or procure to be described the particular lot or land upon which payment shall have been made; and shall be allowed the right to select so much of his original purchase, at his option, as the said payments will cover, deducting from the original price stipulated for, 33⅓ per centum.

The second section provides, that the purchaser shall relinquish all claim to the lots or lands which he does not choose to purchase, (that is, to complete the payment on deducting 33⅓ per cent.,) and, in writing, make his selection known to the Board of Canal Commissioners, who are directly authorized and required, to procure and deliver to such purchaser, a deed or patent for the lands or lots, agreeably to the laws in force for patenting lands and lots sold by the Canal Commissioners.

The third section provides, that if any balance shall be due by the purchaser, that the same shall be paid; but if there is a balance due to the purchaser, after his selection, and application of payments, then it shall be liquidated by a further conveyance, by the Commissioners, of other lands or lots, originally sold, at the original price, deducting 33⅓ per cent.

The fourth section declares in what manner the division or subdivision of lots may be made.

(1) Acts of 1841, 49.

The fifth section provides, that payments may be placed on land other than town lots, though this provision is supposed to have been rendered nugatory by the proviso to the seventh section of the act, which confines the act to the town lots of Chicago and Ottawa.

The sixth section requires a record of the proceedings had, under the act, to be kept by the Commissioners, and a report to be made to the General Assembly.

The seventh section declares, in these words, that "the rights of the purchasers, under the provisions of this act, may be the subject of transfer, in writing, signed by the purchaser, or his legal representative, which shall be filed and recorded by the Board."

This is an analysis of the whole act.

Before proceeding to an examination of the rights conferred on the purchasers, and the duties required by the Commissioners, under the several provisions of the act applicable to the present case, it may not be improper to enquire whether, if the Commissioners, in the execution of their duties under the act, had allowed parties who were original purchasers, and who had made their payments of instalments, as they became due, according to contract, and who were not in default, and had not, in any way, incurred a forfeiture, by not complying with the stipulations of the contract, to avail themselves of the full benefits of the act, such a decision would have been against the equitable construction of the act. It is true it would have been out of the letter of the act, for the first section requires that these facts shall concur, to entitle the party to the benefit of the law:

*First.* That he shall be an original purchaser of a lot.

*Second.* That he shall have made advances by way of payment for the same.

*Third.* That he shall have forfeited the lot purchased, by not complying "with the other stipulations of the contract," beyond the first payment. Now the party who had punctually, and in good faith, observed the performance of his contract, is not recognised, by the letter of the act, as one of the persons for whose benefit the act was adopted; yet it would be repugnant to every principle of equity and exact justice, to exclude him from a participation in its equitable objects.

It could not have been intended, that he who had been unable to complete his engagement, or unwillingly neglected its performance, should alone reap the beneficent provisions contemplated by its framers, and intended to be conferred alike on the purchasers of the property sold by the State, at a price admitted to have been greatly beyond its real value, at the time of sale; while it is certain that a construction admitting a party, in such a case, to participate in the benefits of the law, could not be rested on its letter; the spirit, intention, and equity of its provisions, would abundantly sustain the propriety of such a decision. The relief was not in-

tended to be partial, and confined to those alone who had forfeited their titles. Its objects were broad and comprehensive, and it was intended that all purchasers should participate equally in its liberality. Suppose that another class of cases had been admitted to a participation in the benefits of the act, viz., such persons as took advantage of the previous act, of 2d of March, 1839, allowing a postponement of payment for twenty years, on paying yearly six per cent. interest on the original purchase money.

In admitting this class of purchasers to a participation in the present law, it would be done under a liberal construction of the act, bearing in view the object and intention of the legislature, and might, under such a principle, be correctly done. To determine, however, the question presented, we are to apply the well known and acknowledged rules applicable to the construction of statutes; to look at the real object and intention of the law maker, as gathered from a comparison and examination of the whole context of the act, its spirit, and import.

The act in question, as its title indicates, is for the relief of the purchasers of the lots designated in the law; and hence it is important to enquire what is the relief thus granted.

*First.* It is a right of relinquishment of purchase.

*Second.* A transfer and consolidation of purchases and payments, from one or several lots, to one or more, in full payment and obtention of complete title.

*Third.* A right of the purchaser of selecting such a portion of a lot, as his previous payments will cover, and the relinquishment of the residue of the lot.

*Fourth.* If his several payments will more than cover the price of a single lot, then the residue is to be extinguished, by a conveyance of so much of another lot, which has been relinquished, as the excess will pay for, not less than the legal subdivision named in the act.

*Fifth.* A discount of 33⅓ per cent. from the original price.

*Sixth.* A power to transfer his rights to another, by assignment, vesting his title in his assignee.

Under these rights, thus acquired by the law, it is conceded, that if a person purchased originally more than one lot, on which he had made previous payments, he may relinquish as many of the lots purchased as may be necessary, and transfer and apply his payments made on such lots, to the one lot which he desires to retain, and thus obtain, by full payments, a perfect title to the whole lot.

That if he is an original purchaser of a single lot, and has made one payment thereon, and has acquired, by assignment from another purchaser, who has made a payment on a lot, his certificate of such payment, before the passage of the act, he may then apply the amount of such payment, expressed in the certificate, to the lot he originally purchased, and if it completes the payment, de-

ducting the 33⅓ per cent. from the original price of the lot he desires to retain, obtain a title therefor.

So where he has acquired a title by assignment of certificate, and becomes a purchaser by assignment, before the passage of the act, not being an original purchaser himself, he may make a consolidation of payments, on one or more of the lots acquired by assignment, and obtain a title.

If these payments and consolidations may be done because the first is within the letter, and the two latter cases are within the intention, spirit, and equity of the act, and its objects are best carried out by such an interpretation, why may not Hamilton, the relator, who is a purchaser by assignment, apply his certificates to the extinguishment of the amount due on lot four, [4] originally purchased by him? His case is surely not less equitable because he may be supposed to have acquired the certificates by assignment after the passage of the act, but which fact does not so appear in the case; and he may as well be presumed to have acquired them before, as after the passage of the law. But if such were the fact, it would surely not alter the justice or equity of the case, or change his rights. His assignor had the right of consolidation and relinquishment under the act, and why shall not the legal assignee possess all the rights of the assignor, which must have passed to him by the transfer? What, it may be asked, is the difference in the present case, in allowing the relator to consolidate the assigned certificates with his own on one lot; or compelling the assignor to consolidate his three certificates on the fourth. In the one case, seven out of eight lots are relinquished, and in the other, six. Of what importance can this be in a pecuniary point of view? None, it is apprehended, unless it be that by compelling the assignor, Hubbard, to consolidate, the State looses the 33⅓ per cent. discount on the value of the lot he retains, while, if Hamilton applies the four certificates assigned to him, the State saves the discount which Hubbard would receive.

Let it, however, be enquired whether, even under the letter of the act, the right of the assignee is thus restricted and limited, as is contended.

The seventh section of the act, declares that the rights of the purchasers, under the provisions of this act, may be the subject of transfer in writing, signed by the purchaser or his legal representative, which shall be filed and recorded by the Board.

For what purpose or object was this provision inserted, if it did not intend thereby, to directly recognise the right contended for? What meaning shall be attached to it, if this is not the true one? It could not be supposed to refer to the right of mere assignment of certificates, without carrying with it the interest acquired by the passage of the act, because the act of the 16th of January, 1839, in force at the time of the passage of this act, had already made

ample provision for such assignments and transfers, and autho-rized patents to issue in the name of the assignee.

Again. Could the terms used, of rights acquired under the act itself, be construed to be rights acquired before the passage of the act? Certainly not. May it not then be justly said to refer to the right of relinquishment, the right of consolidation of payments, the right of deduction of $33\frac{1}{3}$ per cent. of the price of the original pur-chase; and that rights so acquired, should be the subject of assign-ment and transfer? If, then, this section be construed, as its lan-guage would clearly import, and when taken in connection with the contexts of the other parts of the act, its spirit and equity imply, there is no difficulty in declaring the right to exist as as-serted; and a decision in affirmance of such right, but declares the actual and evident intention of the framers of the act. Suppose, however, that this construction be rejected, and that in construing the act, the words " under the provisions of this act," in the seventh section, be rejected, as useless and surperfluous words, leaving the sentence to read thus: " The rights of the purchaser may be the subject of transfer in writing signed by the purchaser or his legal representative." What rights, we ask, are declared shall be the subject of transfer? It is most evident, that it is the previous right acquired by the original purchaser, under the sale, which is thus de-clared shall be the subject of transfer in writing; and if of transfer, for what purpose, but to vest in the assignee, who becomes a purchaser by assignment, all the rights acquired by the first purchaser, which are of consolidation, relinquishment, and payment by application of certificates, with the deduction of $33\frac{1}{3}$ per cent? Either con-struction, then, establishes the right asserted by the relator, to exist in him, by the transfer to him of the four certificates by Hubbard. It can, surely, be of little consequence, who is benefited by the provisions of the act, if he is the legal and *bona fide* owner of the title to the certificate of payment made; whether he is the pur-chaser, by assignment and transfer, or is an original one, of all the certificates he proposes to relinquish, will not vary the result; the effect would seem to be the same in either case.

It is not thought that the legislature intended that its bounty should be stinted in its application, by technical objections, and nice distinctions, to prevent the legal holder of these evidences of payment and title, from fully realizing the relief granted; nor would it be in accordance with the benevolent motives, which, doubtless, actuated it in passing the law, to thus deprive the holder of the assigned certificates, of the advantages intended to be con-ferred on all; it would but ill accord with what seems clearly to have been the views of the General Assembly.

When the United States' Government permitted similar applica-tions and consolidations, under an act of Congress, whoever was the holder of the certificate, received the benefits of the act, no matter whether he was the original purchaser or the assignee.

It was strongly insisted on, in the argument, that if the construction contended for by the relator's counsel, was adopted, it would open the door to speculations, and be highly prejudicial to the canal fund, by suffering parties to select good lots, and relinquish bad ones. This argument is considered fallacious and ideal. It proceeds upon an assumption of facts, of which there is no evidence. How can it be assumed, that a portion of the lots in question are worthless? In what manner does it appear, and where are the evidences to establish it? Certainly not in the case. If, however, we could judicially look into extrinsic evidence, beyond the record, we still have no proof to sustain the allegation. These lots were required by law, to be all valued before sale. That they were so valued, is not only the presumption of law, but is proven by history to be matter of fact. That all were valued by the standards of value of real property in the region in which the lots are, as it was estimated in 1836, in the very heart, and amid the scenes of delusion, deception, and exaggeration of those days, is believed to be an indisputable matter of history now. That each lot was valued, in relative proportion to the value of others, as to eligibility of situation, and adaptation to commercial, or other useful and valuable purposes, and was not permitted to be sold for less than its appraised value ; and if it is intended to be understood that the outer lots are the refuse ones, which are to be relinquished, of which we have no means of judging, and, therefore, affirm nothing relative thereto, to the injury of the canal fund, it is thought that little is hazarded, in affirming that it may readily be believed, that great misapprehension exists in relation thereto. It is understood that the proportionate value affixed to such lots, and those in the more business parts of the town, was greatly in favor of the first over the latter, and that it still maintains, from the existence of adjacent improvements, and other causes, that relation. Hence it is by no means probable, if such lots should be relinquished, that the effects imagined could arise. But with the consequences and results, the Court have little to do, on the present occasion. The arguments, drawn from such a position, are not legitimate.

It is, nevertheless, true, if it were apparent, that by a particular construction of a law, in a doubtful case, such construction would be likely to endanger, or to actually sacrifice great public interests, it would not, and ought not to be intended that such a construction was contemplated by the legislature, in disregard of such interests.

In the present case, not only such supposed injuries are neither seen, nor anticipated ; but seem impossible ever to happen. How can the transfer, where the relative value of each lot has been already fixed, of one payment on a particular lot, to another, produce injury? The scale is equal. The relinquishing party gives back the lot, and applies his payment to another ; both have been valued ; and if he gives up a lot, valued at a low price, he transfers his pay-

ment to one of a higher price. The benefits and the injuries, if any exist, are equal. Neither benefit or lose, by the act, except that the party relinquishing gets the deduction allowed by law, and is enabled to complete his title; and the State receives back her lands, with at least the possible advantage, by the future growth of the town, of obtaining, eventually, a greater price for her property. These arguments are, however, unnecessary. The immediate, as well as the remote consequences of the act, are presumed to have been not only understood, but maturely considered by the legislature, when it passed the act. Of its expediency and propriety, it was the legitimate judge, and it is not for this tribunal to determine whether it was impolitic or unwise. It is to ascertain its just, reasonable, and true construction; and when that is satisfactorily ascertained, it has but to pronounce the conclusion to which it has arrived.

We are of opinion that the application for the writ be allowed as prayed for.

BREESE, Justice, delivered the following dissenting opinion :

The relator in this case, claiming to be the assignee of Henry G. Hubbard, by assignments made to him, as admitted on the argument, since the passage of the act of the General Assembly of this State, entitled "*An Act for the relief of purchasers of Canal Lots in Chicago and Ottawa, in* 1836," (1) of certain certificates of purchase of lots in Chicago, sold as canal property, in that year, applied to the Board of Canal Commissioners to relinquish all the lots designated in the certificates, and apply the purchase money specified in them, to another lot or lots, of which the relator was the original purchaser.

The Board refused the application, and on a case made by the relator and the Board, it being represented here by Mr. Morris, the President thereof, a peremptory *mandamus* is now moved for, to compel the Board to allow the application.

The relator bases his right to make this application of the certificates of purchase assigned to him, upon the act of 1836–7, pages 153–4, and the act of 1841, above referred to.

The majority of the Court are of opinion, that by a proper construction of those acts, the relator is thus entitled; and as I dissent from them, and believing there are very important interests involved in the construction of the last mentioned act, duty to myself, and respect for them, require that I should state the reasons for such dissent.

The first mentioned act (2) needs no construction; its terms are plain and easily to be understood; its design being nothing more than to place the assignees of purchasers in the same situation with regard to the lot or lots purchased, as the original pur-

(1) Laws of 1841, 49—50.　　　　(2) Laws of 1836-7, 153-4.

chaser occupied, so that patents might issue to such assignees.    It was intended to protect and confirm the rights of assignees.

In placing a construction upon the other act—that of 1841—some regard must be paid to the circumstances under which it was enacted by the legislature, for the purpose of discovering, in connexion with its title and language, the object the General Assembly had in view, in passing it.    The facts accompanying the sales of canal lots in Chicago and Ottawa, when they were sold, and the object for which they were sold, must also be regarded.

The lands on which these towns are located, was granted to the State for the purpose of constructing a canal, and they were sold to supply means for that purpose.    At a time when property of almost every description, and these lots in particular, had a fictitious value put upon them, in 1836, they were offered for sale on a credit of one, two, three, and four years, the purchaser paying in instalments, the amount of his purchase.    Some of the purchasers paid one or more instalments as they became due, and some did not; almost all having, when the act under consideration was passed, forfeited their payments to the State, by reason of their noncompliance with the terms of sale.    In this attitude, they presented themselves before the legislature.    A change of times, which they could not foresee, had disabled them from complying with their contracts, and not wishing that the payments they had made should be wholly lost to them, asked that some terms might be prescribed, by which their payments could be saved to them.    They desired relief from the embarrassments under which they were placed, and in a spirit of liberality and justice, the General Assembly declared, in the first section of the act, the terms on which they would grant relief, as follows: " upon the conditions hereinafter mentioned, that is to say, every person who has paid any money upon such purchases, shall first ascertain the amount from the proper authority, and next, he shall have, or procure to be described, the particular lot or land upon which payment shall have been made, and shall be allowed the right to select so much of his original purchase, at his option, as the said payments will cover, deducting from the original price stipulated for, thirty-three and one-third per centum."

The second section provides for relinquishing to the State, by the purchaser, such lands as he does not choose to purchase, and make his selection known to the Board, who are to procure and deliver to the purchaser, a deed or patent for the part selected.

The third section requires, that if there is any balance due the canal fund, after making the above deduction of $33\frac{1}{3}$ per cent., it shall be promptly paid by the purchaser; and in no case is the Board allowed to issue scrip of forfeited payments, that may in any event become currency, for the payment of any other lands or lots belonging to the canal, at any other than the amount of purchase; but if any balance is due the purchaser, it shall be liqui-

dated by the conveyance of lands or lots originally sold, and at the original amount or price given at the time of purchase, with the above deduction.

The fourth section authorizes a purchaser to relinquish a part of a lot by fourths, or halves, in proportion to the above depreciation, by a certain mode of subdivision.

The fifth section authorizes " any purchaser as aforesaid," to place his payment, which has been forfeited, on one piece of land, not a town lot, or one or more town lots, or such particular lot or piece of land as he may deem proper, at the original purchase price, with the above deduction, but in no case is he allowed to place this payment on any other lands or lots, at any other price, or valuation, than the depreciated valuation.

The sixth section requires the Canal Commissioners to keep a just and full record of all proceedings under the act, and report the same to the next meeting of the General Assembly.

The seventh section is in these words : " The rights of the purchasers under the provisions of this act, may be the subject of transfer in writing, signed by the purchaser, or his legal representative, which shall be filed and recorded by the Board ;" a proviso follows, restricting the act to town lots sold in Chicago and Ottawa, in 1836 ; " being for the relief and benefit of those purchasers and none others."

The terms of this act, would lead me to believe that it was originally intended by some of those interested in its passage, if the construction placed upon it by the relator, be the correct one, to perpetrate a great injury upon the State, which the proviso in the last section prevented. The law was made applicable to canal lands sold on a credit, and after being stripped of their timber, they could be relinquished to the State, and the amount paid on them applied to other lands. The legislature never would have passed this law, if such consequences were to flow from it ; and yet they would most certainly have resulted, if the proviso had not been inserted at the end of the act.

It can hardly be believed, if the proviso was not in the act limiting it to town lots, that the act would receive a construction by which the consequences I have alluded to, would be produced ; yet if it is liable to the meaning the relator contends for, as applicable to town lots alone, it would be equally so, without the proviso, to lands, and the canal fund thus subjected to immense injury and waste. The purchaser of a tract of timbered land, after getting from it all that made it valuable, would sell and assign his certificate to another purchaser, who had purchased another tract for agricultural purposes, to complete his payment to the canal fund. In this way, this fund would bear all the loss arising from these spoliations, in addition to that which would result from receiving the certificate in payment, instead of the money which would be paid by the other purchaser, who had improved his land. It would be

a censure upon the intelligence of the legislature, to suppose they intended any such thing.

Their intention was merely to afford relief to the original purchasers of lots, and the whole plan of relief is fully developed by the first and fourth sections of the act. It is munificent and paternal, enabling a purchaser to complete his title to as many lots, or parts of lots as his payments might cover; and the original price reduced $33\frac{1}{3}$ per cent. This, in my judgment, is all the act intends, to relieve the purchasers from their obligations to pay any more money to the canal fund, except the balances that their certificates may not reach, after making the above deduction; to permit them to have the full advantage of the money they have paid, in one or more lots, or parts of lots, of their original purchases.

With all becoming deference to the opinion of the majority of the Court, it seems to me, that any further extension of the act, by construction, would subvert the design the legislature had in view, in passing it; would open wide the door for fraud and speculation, and deprive the State of a large portion of its anticipated means to complete a most magnificent enterprise.

By the construction given to the act, a person who purchased in Chicago or Ottawa, from Canal lots, for example, in 1836, at the price of $1000 each, and has paid one half the purchase money on each lot, may abandon all his purchases; dispose of his certificates by assignment, to a person who has a payment to make on a valuable lot he has purchased, and designs to retain, and thus enable this purchaser to complete his payments. And here the question may be asked, how is the Board of Commissioners to protect the State against fraudulent assignments of these certificates? How can they test their validity? No mode is pointed out by the act; and thus it may become, not a measure of relief, but a source of great and extensive frauds. By this construction, the four lots partially paid for, and perhaps of but little value, will be abandoned to the State, and the canal fund deprived, it may be, of many thousand dollars. By the construction for which I contend, the purchaser of the four lots may select any one or more of them, or any of their parts, equal to one-half or one-quarter of a lot, and apply the money paid to the part thus selected, be it one lot, a half, or a quarter lot, and completing his payments in this way, by relinquishing the balance of the lots, obtain a title to the part retained, and his assignee, under the seventh section of the act, is enabled to do the same thing, and nothing more. He can select any lot or part of lot indicated in the certificate he holds by assignment, and relinquish the part which the payments made will not cover.

If, under the construction contended for by the relator, these certificates of original purchase are to become an article of traffic, then the canal fund must be subjected to a very heavy loss. It is no doubt the fact, that very many of the lots have lost the principal value set upon them, at a time when speculation was so rife in that

The People *v.* The Canal Commissioners.

region, and elsewhere. Some of them may be of a nominal value only, on each of which payments have been made to the amount of a thousand dollars, for which certificates are held by the original purchaser, or his assignee, under the act of 1836. This money was forfeited to the State, before the passage of the act of 1841; and consequently, the certificates were greatly depreciated, and really of no value. By the act of 1841, value was given to them, in the hands of the original purchasers, to the extent of such parts of their purchases as the payments made would cover; but by the construction given to the law, if the lots specified in them should not be of much value, they can be raised from them, and thrown into market for sale. A may hold four such certificates, each indicating the payment of $1000, but now so much under par, by reason of the real want of value in the lots purchased, as to be worth only $100 each. He sells one to B, to C, to D, and to E, each of whom have payments of $1000 to make, on valuable lots they have improved and desire to retain. Each one buys a certificate of $1000, for $100, by which each one pays the canal fund the debt he owes, and so in greater or less proportion, according to the scale of depreciation. In this way the canal fund loses, by each of these purchasers, the whole amount due from each one, which he would otherwise have paid to secure his lot. This act would thus create a depreciated paper, with which to pay these debts, and bring upon the canal fund these heavy losses, to an extent I have no means of ascertaining, but certainly not inconsiderable. It is, in truth, giving that amount to each purchaser of a valuable lot. Can it be supposed that an act intended for relief only, was to be made the instrument of so much mischief? That the legislature would surrender up in this manner, the property and interests of the State, of which they were the constitutional guardians? I cannot believe it; and finding nothing in the act forcing me to such a conclusion, I cannot arrive at it. According to my understanding of the act, the original purchaser himself cannot surrender the whole of his purchase, and apply the money paid on it to another lot. Why then should his assignee have the privilege? There can be no reason shown why he should possess a right the original purchaser does not possess. I cannot believe that the legislature intended any such application of the certificates as the relator claims; there is nothing in the act indicating, to my mind, such an intention.

In doubtful cases, such as this must be admitted to be, a construction should not be given to a legislative act, which may work a great public injury; the reasonable presumption always existing, that no such consequences were intended. I am, therefore, of opinion the *mandamus* should not be awarded.

TREAT and DOUGLASS, Justices, also dissented.

*Peremptory writ of Mandamus awarded.*